KELLY, J.
(dissenting). I disagree with the majority’s conclusion that the Pontiac Fire Fighters Union failed to meet its burden of showing that the proposed layoff of 28 firefighters would cause irreparable harm to the remaining firefighters.[1] The union alleged that the layoffs would lead to the closing of fire stations and would lengthen the time for responding to fires. The *14 firefighters would travel longer distances to reach fires and would encounter longer-burning, and therefore more dangerous, fires. The fire chiefs affidavit on behalf of the city did not rebut this allegation. To the extent that it granted injunctive relief on the basis of this unchallenged allegation, the circuit court did not abuse its discretion.[2]
The union alleged in counts 9, 24, and 25 of the verified complaint that the layoffs would affect firefighter safety:
9. Plaintiff is informed and believes that if the unilateral layoff decision is implemented, the Pontiac Fire Department will undergo substantial adverse reorganization which will include the closing of fire stations, the reduction of staffing on fire apparatus, the elimination of EMS-ALS rescue units, the realignment and expansion of fire territories, the elimination of mutual aid participation for hazardous materials and technical rescue responses, and other unilateral changes many of which will constitute violations of the Agreement in such matters as staffing, reduction of personnel on vacation, and use of Kelly days.
24. The layoff of 28 fire fighters and fire fighter paramedics will reduce the fire extinguishment and medical/rescue capability of the Fire Department to unacceptable levels posing a threat and hazard to fire fighters and citizens alike.
25. The .reorganization of the Fire Department, the substantial reduction of personnel, and the closing of fire stations will increase response time to a fire scene and/or medical/rescue run. Increased response time of emergency *15 equipment poses a hazard to responding fire fighters and citizens on the route. As a consequence of delay in responding to a fire scene, the fire escalates making extinguishment more difficult and increasing the danger to fire fighters and possibly occupants of a dwelling. The number of personnel at a fire scene will be limited and reduced to unsafe levels.
The city countered these allegations with an affidavit from Fire Chief Wilburt McAdams, which stated in relevant part:
2. That the great majority of calls to which the department responds are medical runs.
3. That the department will continue to maintain minimum staffing levels. In the event the department is at the minimum level of seventeen firefighters on a given day, private ambulance services will be used to respond to medical runs, and the City’s firefighters will be used solely for fighting fires.
4. That, even after the layoff of the 28 firefighters, the department will have 89 firefighters, and will continue to operate utilizing both an incident command system and the “two in two out” rule which forbids any firefighter from entering a structure fire unless he/she is accompanied by another firefighter and there are two firefighters outside the structure. In addition, the department will continue to assign a safety officer to each fire. The number of firefighters at a fire scene will not be impacted.
5. Using the incident command system, firefighters will not enter a burning structure until there has been a careful assessment of the fire and the incident commander allows entry.
4. [sic] That, in addition, the department will continue to be in compliance with all applicable departmental rules and regulations of the City of Pontiac and State of Michigan, including all OSHA regulations. The statements of the NFPA are not binding rules and have not been adopted in Michigan.
*16 5. [sic] The number of firefighters per rig will actually increase from 3-4 currently to 4 for all engines. In addition, the department will continue to participate in mutual aid, under which firefighters from other departments .. . can be called for assistance if needed.
The union’s complaint alleged both that fewer firefighters would be available to fight fires and that their response time would be increased. The fire chief averred that the number of firefighters available to fight fires would remain the same, and so would the safety rules. However, the fire chief did not offer a solution to the problem of increased response time. Nor did he explain how existing safety rules would protect the firefighters who would confront more intense fires.
The circuit court issued a preliminary injunction specifically on the basis of the union’s allegation that the closing of fire stations would affect the remaining fire stations’ response time:
. . . Plaintiff may be irreparably harmed since a reduction in the workforce and the closing of several City fire stations would result in a significant increased risk of harm for the remaining firefighters. Fewer fire fighters [sic] would be available to respond to fires and the closing of stations caused by the lay off would result in the firefighters having to cover a larger territory. The remaining firefighters would thus not be able to respond as quickly as they used to which means that they would be faced with fires that have increased in intensity or size and as a result are more dangerous.
The majority faults the circuit court for not considering the fire chiefs affidavit, and it faults the union for not offering additional evidence in response to the affidavit. At the show-cause hearing, the union did offer to present additional testimony and diagrams of the *17 runs.[3] Thus, the union cannot be faulted for failing to present additional evidence. The majority’s conclusion that the circuit court failed to consider the fire chiefs affidavit is also unpersuasive. Rather, the union met its burden of proof through the unchallenged allegations in its complaint. To the extent that the circuit court based its order on these unchallenged allegations, it did not need to address the fire chiefs other averments.
The circuit court did not abuse its discretion in concluding that irreparable harm to the remaining firefighters called for injunctive relief.[4] I would affirm the judgment of the Court of Appeals and the preliminary injunction.
WEAVER and CAVANAGH, JJ., concurred with KELLY, J.

 The union had filed an unfair labor practice charge against defendant with the Michigan Employment Relations Commission (MERC). It requested an injunction from the circuit court “pending resolution of the parties’ dispute by MERC.” It also asked for and received from the court an injunction to maintain the status quo pending compulsory arbitration under Act 312, MCL 423.231 et seq. But no Act 312 arbitration was actually pending when the circuit court issued the injunction. The injunction was properly issued in aid of MERC’s jurisdiction over the unfair labor practice charge.

 MCR 3.310(A)(4) states that “[a]t the hearing on an order to show cause why a preliminary injunction should not issue, the party seeking injunctive relief has the burden of establishing that a preliminary injunction should be issued .. ..”

 In deciding not to take testimony, the circuit court followed Campau v McMath, 185 Mich App 724, 728; 463 NW2d 186 (1990). In that and other cases, the Court of Appeals held that an evidentiary hearing was not required for issuing an injunction. See also Fancy v Egrin, 177 Mich App 714, 722; 442 NW2d 765 (1989).

 The court additionally concluded that the union was likely to succeed on the merits because the parties’ contract clearly prohibited layoffs and was in effect until a new contract was negotiated. The city could not use financial hardship as an excuse to violate the contract it had negotiated with the union. The Court of Appeals affirmed this conclusion.